# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**PATRICIA A. BROOKS,**

                **Plaintiff,**

        **v.**

**SUSAN TSUI GRUNDMANN,**
**Chairman, Merit Systems Protection**
**Board,**

                **Defendant.**

**Civil Action 08-100 (RCL)**

---

## MEMORANDUM OPINION

Plaintiff Patricia Brooks alleges that her employer, the United States Merit Systems Protection Board ("MSPB" or "the Board"), discriminated against her on the basis of her race and gender and retaliated against her for asserting her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* Brooks has brought an official-capacity suit against MSPB Chairman Susan Tsui Grundmann,[1] whom the Court will refer to as though she were the Merit Systems Protection Board itself. Before the Court is the Board's motion for judgment on the pleadings or, in the alternative, for summary judgment [Dkt. # 70]. Upon consideration of the motion, the opposition thereto, and the record of this case, the Court concludes that the Board is entitled to summary judgment.

---

[1] The complaint named Neil A.G. McPhee, former Chairman of the MSPB, as the defendant in this case. The current Chairman is substituted as defendant pursuant to Federal Rule of Civil Procedure 25(d).

# I.  LEGAL STANDARD

The Board has moved for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  Such a motion is evaluated under the same standard as a Rule 12(b)(6) motion to dismiss, *see, e.g.*, *Robinson-Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 12 (D.D.C. 2008), and, like a 12(b)(6) motion, must be converted to a Rule 56 motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court."  FED. R. CIV. P. 12(d).  Because such matters have been presented and will be considered, the Court treats this motion as one for summary judgment.

A motion for summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its burden, the non-moving party must then establish that a genuine dispute as to any material fact actually exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To meet its burden, the non-moving party must show that "the evidence is such that a reasonable jury could return a verdict" in its favor.  *Anderson*, 477 U.S. at 248.  Such evidence must consist of more than mere unsupported allegations or denials and must set forth specific facts showing that there is a genuine dispute for trial.  *See*

FED. R. CIV. P. 56(c)(1), (e); *Celotex*, 477 U.S. at 322 n.3.  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249–50.

## II.  FACTUAL BACKGROUND

On this motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in her favor.  *See Venetian Casino Resort, LLC v. E.E.O.C.*, 530 F.3d 925, 929 (D.C. Cir. 2008).

For more than twelve years, Patricia Brooks has worked in the Office of Information Resources Management of the United States Merit Systems Protection Board, an independent, quasi-judicial agency that enforces the merit-based pay and promotion provisions of federal civil service laws.  Pl.'s Mem. in Opp. to Summ. J. ("Pl.'s Opp."), Ex. 1 (Aff. of Patricia Brooks (May 21, 2007)) ("Brooks Aff."), at 2.  Tommy Hwang became the director of that office in 2005.  Pl.'s Opp., Ex. 13 (Dep. of An-Ming ("Tommy") Hwang (June 16, 2009)) ("Hwang Dep."), at 72.  Nick Ngo was his deputy and Brooks's direct supervisor.  *Id.* at 135–36.  Brooks is a black woman.  Hwang and Ngo are Asian men.

Brooks alleges that, in early 2005, Ngo told her that people in the office were questioning whether she deserved her place on the civil service pay scale, Brooks Aff. at 11, and that, in March and April of that year, Hwang and Ngo criticized her performance on several projects.  *Id.* at 8.  In May of 2005, Brooks gave a presentation that was very poorly received by Hwang.  *Id.* at 2; Def.'s Mot. for Summ. J. ("Def.'s Mot."), Ex. 3 (Aff. of An-Ming Hwang (May 8, 2007)) ("Hwang Aff."), at 3.  Although there is some dispute about how Hwang expressed his displeasure, the parties agree that he slammed his hand on the table.  Brooks Aff. at 2; Hwang

Aff. at 3.  According to Brooks, he yelled, belittled her, and angrily threw a notebook in her direction.  Brooks Aff. at 2.  Brooks reported this incident to Neil McPhie, who was then chairman of the Board.  McPhie set up a meeting with his chief of staff, who in turn recommended mediation.  *Id.*  After Brooks and Hwang participated in that mediation session, Hwang sent emails asking Brooks to explain her performance on several assignments.  *Id.*  At the meeting to conduct Brooks's performance appraisal for 2005, Hwang and Ngo criticized her management skills and included that criticism in a document attached to her review.  *Id.* at 4–5.

In early 2006, Ngo suggested that Brooks "beef up" her weekly status reports.  *Id.* at 9.  Later that year, Brooks alleges, he demanded that she provide him with more detailed reports on her progress at work than he demanded from other employees.  *Id.*  Ngo's mid-year review of Brooks stated that she "has tendencies to underestimate effort, issues, and expectations that ha[ve] resulted in missed target dates for projects."  Pl.'s Opp., Ex. 24, at 9 (Fiscal Year 2006 Mid-Year Performance Feedback and Comments (Apr. 21, 2006)).  In late August 2006, Brooks contacted Julio Matta, the director of the equal employment opportunity office for the MSPB, to express her concern that she would be unreasonably held to an arbitrary deadline that she could not meet on a major project.  Brooks Aff. at 3.  In late October, Ngo refused to sign off on Brooks's time sheet, and questioned whether she had worked all of the hours that she claimed on a certain day.  *Id.*  Brooks again contacted Matta.  *Id.*  At a meeting held to discuss Brooks's time reporting on the day in question—and attended by Brooks, Hwang, Matta, and Ngo—Ngo indicated that he had recently been keeping a close watch on Brooks's attendance and her reported hours.  *Id.* at 3–4.  Brooks was ultimately paid for the time in question.  Def.'s Mot., Ex. 6 (Aff. of Nick Ngo (May 8, 2007)) ("Ngo Aff."), at 3.

Several days after that meeting, Ngo conducted Brooks's fiscal-year-end performance evaluation.  According to Brooks, at the evaluation meeting Ngo said that she had difficulty relating to her peers, though he only mentioned a single example—a disagreement between Brooks and a co-worker in which, as Brooks recalls, Ngo had appeared to side with her.  Brooks Aff. at 5–6.  Ngo also criticized her for being late on the project referenced above, even though Brooks believed that the real deadline had not yet passed.  *Id.* at 10–11.  In the written evaluation,  Ngo recorded that Brooks "failed to provide timely weekly activity reports on numerous instances even though management reminded her to do so numerous times" and "did not provide acceptable reasons for the delays." Pl.'s Opp., Ex. 24, at 10 (Performance Evaluation of Patricia Brooks, Oct. 1, 2005–Sept. 30, 2006).  He also wrote that Brooks "needs to work on her listening skills as well as being less argumentative with colleagues."  *Id.* at 11.  Ngo gave Brooks an overall rating of "Minimally Successful" for fiscal year 2006.  *Id.*  Brooks believed that this evaluation was unwarranted.  Brooks Aff. at 5.

On February 20, 2007, Brooks filed a formal complaint with the Board's equal employment opportunity office.[2]  Later that year, she received an annual performance rating of "Fully Successful."  Def. Mot., Ex. 4, at 5–6 (Performance Evaluation of Patricia Brooks, Oct. 1, 2006–Sept. 30, 2007).  Not long after that performance review was conducted, Brooks and Bill McDermott, a coworker, had a confrontation in a team meeting.  After the incident, a series of emails were exchanged.  Brooks stated that McDermott "became visibly angry without provocation and made insulting remarks to me in front of the other Team Leaders," that he

---

[2]  After receiving the Report of Investigation and Final Agency Decision that resulted from this administrative complaint, Brooks brought this suit.  Second Am. Compl. ¶ 8.

"erroneously stated that I did not respond to a question about" a particular software package, and that he "yelled and became so angry that [Hwang] and Nick [Ngo] had to tell him to 'calm down.'" Def. Mot., Ex. 7, at 6 (Email from Patricia Brooks (Nov. 15, 2007, 12:52 p.m.)). Hwang responded to Brooks that he "did not hear any insulting remarks being made to you or anybody else. After Bill [McDermott] made that one loud statement, and a back and forth discussion looked like it was about to ensue, I stated, 'calm down' so that we can stop the discussion and continue with the meeting." *Id.* at 5 (Email from Tommy Hwang (Nov. 15, 2007, 2:46 p.m.)). For his part, McDermott "acknowledge[d] getting visibly angry with Patricia [Brooks] and raising my voice to her. . . . For the record from my perspective there was no 'yelling, screaming or insulting behavior'." *Id.* at 3 (Email from Bill McDermott (Nov. 15, 2007, 2:04 p.m.)).

On February 29, 2008, Brooks filed a second formal complaint with the Board's equal employment opportunity office.[3] Later that year, Hwang undertook an office reorganization. The original draft of the reorganization plan, which was circulated in October 2007 but not intended to take effect until April 1, 2008, would have placed Brooks on a newly-created "Applications Team" with three other team leaders, including McDermott and Craig Thomas. Def.'s Mot., Ex. 2 (Aff. of An-Ming Hwang (Oct. 9, 2008)) ("Second Hwang Aff."), at 2. Thomas had criticized Brooks's work to Ngo. *See, e.g.*, Pl.'s Opp., Ex. 32, at 4 (Email from Craig Thomas to Nick Ngo (Sept. 11, 2007, 11:00 a.m.)). McDermott and Thomas objected to

---

[3]   After receiving the Report of Investigation and Final Agency Decision that resulted from this second administrative complaint, Brooks filed an amended complaint in this Court, incorporating the new claims that she had raised at the administrative level. *See* Pl.'s Mot. for Leave to File an Am. Compl., at 1–2; Am. Compl. ¶¶ 65–69.

Brooks's presence on the proposed team, and Hwang ultimately decided to remove her from it. Second Hwang Aff. at 2.  In the revised reorganization plan, there were only three leaders of the "Applications Team"; Brooks was assigned to an individual role whose duties were identified in the organizational chart as "Document Migration/Macros."  Pl.'s Opp., Ex. 16, at 1 (Email from Tommy Hwang (May 1, 2008, 1:07 p.m.)).  Brooks objected to her new assignment on the grounds that it only required her to perform "basic programming duties" rather than using the "high-level skills such as analysis, project management, and planning" that were required of an employee at her grade.  Def.'s Mot., Ex. 8 (Aff. of Patricia A. Brooks (Nov. 3, 2008)) ("Second Brooks Aff."), at 2.  She characterized the reorganization as creating a "Team of One" that isolated her from her coworkers.  *Id.* at 3.

On May 1, 2008, the day that the reorganization ultimately took effect, Brooks requested a meeting with Hwang and Ngo to discuss her new role.  Second Hwang Aff. at 2.  She suggested that she be given responsibility for quality assurance and configuration management rather than document migration and macros.  *Id.*; Second Brooks Aff. at 3–4.  Hwang replied that he would consider her suggestions if she completed her current projects "fairly quickly."  Second Hwang Aff. at 2.  Hwang, Ngo, and Brooks met again on May 14, 2008 to discuss Brooks's objections to her new role and suggestions for other duties that she might undertake, but no changes were made at that time.  *Id.*; Second Brooks Aff. at 3–4.  On August 13, 2008, Brooks filed a third formal complaint with the Board's equal employment opportunity office.[4]  In

---

[4]   After receiving the Report of Investigation and Final Agency Decision that resulted from this third administrative complaint, Brooks filed a second amended complaint in this Court, incorporating the new claims that she had raised at the administrative level.  *See* Second Am. Compl. ¶¶ 70–78.

October,  Hwang revised the organizational chart to make Brooks responsible for quality

assurance and configuration management, as she had requested in May.  Def.'s Mot., Ex. 9

(Final Agency Decision in the Matter of *Brooks v. U.S. Merit Sys. Protection Bd.*, No. 08-09

(Feb. 20, 2009)),

at 2.

At the end of that fiscal year, Ngo gave Brooks a performance appraisal of

"Unsatisfactory."  Def.'s Mot, Ex. 4, at 6–13 (Performance Evaluation, Patricia Brooks, Oct. 1,

2007–Sept. 30, 2008).  The evaluation was especially critical of her teamwork and her ability to

complete projects successfully and on time.  *Id.*  Ngo placed Brooks on a Performance

Improvement Plan, which she successfully completed.  *Id.*, Ex. 10, (Mem. from Nick Ngo to

Patricia Brooks (Dec. 11, 2008)); *id.*, Ex. 11, (Mem. from Nick Ngo to Patricia Brooks (May 7,

2009)).  She remains employed with the Board.  Brooks Aff. at 2.

### III.  ANALYSIS

"Title VII prohibits federal agencies from discriminating against their employees based

on race or sex," *McGrath v. Clinton*, 2012 WL 247996, at *2 (D.C. Cir. Jan. 27, 2012), "and

from retaliating against them for asserting their rights under Title VII."  *Calhoun v. Johnson*, 632

F.3d 1259, 1261 (D.C. Cir. 2011).[5]  To prove a case of discrimination or retaliation under Title

---

[5] Although federal agencies and private employers are covered by different—and
differently-worded—provisions of Title VII, *compare* 42 U.S.C. § 2000e-2(a)(1) (barring
discrimination by private employers) *and id.* § 2000e-3(a) (barring retaliation by private
employers) *with id.* § 2000e-16(a) (barring discrimination by federal agencies), the D.C. Circuit
has held that "Title VII places the same restrictions on federal . . . agencies as it does on private
employers." *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005) (quoting *Singletary v.
District of Columbia*, 351 F.3d 519, 523–24 (D.C. Cir. 2003)) (internal quotation marks omitted
by *Singletary*).  Therefore, courts in this circuit freely apply precedents interpreting 42 U.S.C. §§
2000e-2(a)(1) and 2000e-3(a) to the context of federal employment.  *See George*, 407 F.3d at

VII, a plaintiff must demonstrate either that she has suffered an adverse employment action, *see Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (discrimination); *McGrath*, 2012 WL 247996, at *2 (retaliation), or that she has been subjected to a hostile work environment, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (discrimination); *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006) (retaliation).  Brooks claims only the latter, alleging that the MSPB discriminated against her on the basis of race and gender and retaliated against her for asserting her Title VII rights, all by subjecting her to a hostile work environment.[6]

The standards for finding a workplace illegally hostile are "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  "To prevail on a hostile work environment claim, a plaintiff must show that his employer subjected him to discriminatory [or retaliatory] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011) (internal quotation marks omitted); *Hussain*, 435 F.3d at 366 (applying the standard to a retaliation claim).  "'[C]onduct must be extreme to amount to a change in the terms and

---

411; *Singletary*, 351 F.3d at 523–24; *Ethnic Emps. of Library of Congress v. Boorstin*, 751 F.2d 1405, 1415 n.13 (D.C. Cir. 1985) (noting that 42 U.S.C. § 2000e-16 implicitly "prohibits retaliation against federal employee invoking Title VII rights").

[6] The complaint frames each of its three counts in terms of a hostile work environment, 2d Am. Compl. ¶¶ 79–81, and both plaintiff's memorandum in opposition to the motion at issue here and her sur-reply, leave to file which is hereby granted, reaffirm that theory of the case.  *See* Pl.'s Mem. in Opp., at 26–27, 38; Pl.'s Sur-reply at 1–2, 8.  Because Brooks does not assert that she has suffered a discriminatory or retaliatory adverse employment action, the Court need not and does not consider whether any of the incidents described above might satisfy that element of a prima facie case.

conditions of employment.'  For example, 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'"  *George*, 407 F.3d at 416 (quoting *Faragher*, 524 U.S. at 788).  "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory [or retaliatory] conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Baloch*, 662 F.3d at 1201.

An employee subjected to no more than the "ordinary tribulations of the workplace" does not have a cause of action under Title VII.  *Faragher*, 524 U.S. at 788 (quoting B. LINDEMANN & D. KADUE, SEXUAL HARRASSMENT IN EMPLOYMENT LAW 175 (1992)).  For instance, non-selection for a desirable position, assignment to undesirable duties, sharing a small office, and being criticized by supervisors do not establish a hostile work environment.  *Veitch v. England*, 471 F.3d 124, 130–31 (D.C. Cir. 2006); *cf. Singletary*, 351 F.3d at 528 (remanding to the district court for a determination on the merits of a hostile work environment claim where an employee was "intentionally assigned . . . to work in an unheated storage room for over a year and a half" even though more suitable offices were available).  Even conduct that "reflect[s] poorly upon the professionalism" of the defendant's employees may not be severe and pervasive enough to create an abusive environment.  *Barbour v. Browner*, 181 F.3d 1342, 1348 (D.C. Cir. 1999); *cf. Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995) (holding that an "incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability").

Brooks alleges that she has been unjustly criticized, marginalized, and humiliated at work

over a period of many years.  She points to the incidents in which Hwang and McDermott raised their voices during meetings, to her placement in a "Team of One" for four months in 2008, to the negative performance appraisals that she periodically (and, she argues, unjustly) received, and to smaller instances of allegedly disrespectful behavior that are not recited above.

No reasonable jury could find that this conduct was so severe and pervasive as to alter the conditions of Brooks's employment.  With the possible exception of the meeting at which Hwang allegedly threw a notebook in her direction, none of the conduct that Brooks describes was physically threatening.  *Cf. Harris*, 510 U.S. at 23.  The meetings in which voices were raised at Brooks occurred two-and-a-half years apart, suggesting that they were "isolated incidents."  *George*, 407 F.3d at 416 (quoting *Faragher*, 524 U.S. at 788).  Moreover, courts have held that "[c]riticisms of . . . work and expressions of disapproval (even loud expressions of disapproval)" are not sufficiently severe to constitute a hostile work environment.  *See Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004).  Much of the humiliation that Brooks experienced derived from her assignment to responsibilities that she considered to be beneath her qualifications, from negative performance evaluations, and from a four-month isolation on a "Team of One," but "courts have generally rejected hostile work environment claims that are based on work-related actions by supervisors."  *Grosdidier v. Chairman, Broad. Bd. of Governors*, 774 F. Supp. 2d 76, 110–11 (D.D.C. 2011); *see also Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context.").  And although Brooks alleges that she and her work have been regularly disrespected, a Title VII

"[p]laintiff must show far more than . . . criticisms[] and snubs or perceived slights to establish a hostile work environment." *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 82 (D.D.C. 2007).

A hostile work environment claim must be evaluated on the "totality of the circumstances." *Baloch*, 662 F.3d at 1201. Viewing the evidence in its totality and in the light most favorable to Brooks and drawing all reasonable inferences in her favor, as a court must on a motion for summary judgment, *see Venetian Casino*, 530 F.3d at 929, this Court concludes that no reasonable jury could find that Brooks has been subjected to a hostile work environment within the meaning of Title VII. Rather it is plain that she has been subjected to no more than the "ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788. The Court therefore grants summary judgment in favor of the defendant.[7]

## IV. CONCLUSION

This is not "a court of personnel appeals," *Nurriddin*, 382 F. Supp. 2d at 107 (quoting *Alfano*, 294 F.3d at 377), and it does not determine whether employees have been treated fairly, but only whether they have been discriminated or retaliated against in violation of Title VII. Because no reasonable jury could conclude that Brooks has suffered such

---

[7] Because the Court reaches this conclusion, it need not determine whether any reasonable jury could find that, as Brooks attempts to show, plaintiff's co-workers who are not black, or women, or have not invoked their Title VII rights have been treated with more leniency than she has and therefore conclude that the events in question were connected to a status protected by Title VII. *But see Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005) ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.") (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)); *Ware v. Billington*, 344 F. Supp. 2d 63, 71 n.1 (D.D.C. 2004) ("[I]t is not enough to merely show harassment, for Title VII does not prohibit all forms of workplace harassment, only those directed at discrimination because of [a person's protected status].") (internal citation omitted).

discrimination or retaliation, it is this 29th day of March 2012 hereby

      **ORDERED** that summary judgment is **GRANTED** in favor of the Merit Systems

Protection Board.  A separate judgment accompanies this opinion.

Royce C. Lamberth, Chief Judge
United States District Court
      for the District of Columbia
